PHALEN & MORRIS *vs.* THE STATE OF MARYLAND.—*Dec.*
*Term* 1841.

</div>

By the act of 1816, chap. 89, the Visitors and Governors of W. College were authorised "to propose a scheme or schemes of a lottery for raising a sum " not exceeding, &c., clear of all expenses, and to dispose of, or sell all or " any of the tickets of said lottery or lotteries, and to draw the same, or to " authorise any other persons to draw the same," &c.

By the act of 1821, chap. 46, the V. and G. of St. J's. College were authorised "to propose a scheme or schemes of a lottery or lotteries for raising a " sum not exceeding, &c., and to sell such scheme or schemes to any per-

"sons whatsoever, and the purchaser or purchasers thereof, are hereby "empowered to sell and dispose of the tickets in the said lottery or lot- "teries."

Upon these acts it was *held*—

1. The assignees, of the V. and G. of the Colleges, of the franchises created by those acts, possessed no greater powers than their assignors.
2. The terms of those acts are unambiguous.
3. They communicate an authority to propose a scheme or schemes for rais- ing a limited amount.
4. When the schemes for raising that amount have been proposed and drawn, the authority given by those acts has performed its office, whether the let- ter of the act or the legislative intent is regarded.
5. It was the intention of the Legislature, that the sum specified should be raised; it gave adequate means for its accomplishment; it was the duty of the owner of the schemes, in the exercise of his franchise, previously to drawing such schemes, to have sold all the tickets. In that mode was the amount authorised to be raised.
6. It being admitted that if all the tickets had been sold, in the schemes which have been drawn under the acts of 1816 and 1821, that a larger amount would have been raised than was authorised by them, the franchise thereby created was held to be exhausted.

The act of 1817, chap. 154, declaring the effect and construction of previous lottery grants, so far as to show under what circumstances those grants shall be deemed exhausted, must be regarded as of overwhelming influence in the decision of similar questions arising under grants made subsequent to its passage.

Where parties claim to exercise a lottery privilege, under a grant which in point of law is exhausted by proceedings under it, the parties so claiming and acting may be restrained by injunction.

APPEAL from the Equity side of *Baltimore* County Court.

On the 18th February, 1840, the *State of Maryland* exhibit- ed its bill of complaint alleging, that heretofore, to wit, by an act of Assembly, passed at December session 1816, and en- titled "An act to authorise a lottery or lotteries to raise a sum of money for the purpose of repairing, and raising a sum of money for the use of Washington College," and by two several supplements thereto, the one passed at December session 1821, and the other at December session 1823; and also by a further and other act of Assembly, passed at December session 1821, entitled "An act for the benefit of St. John's College," certain powers were conferred on the governments respectively, of Washington College on the Eastern, and St. John's College

on the Western Shore, and among them the power to dispose
of the schemes of lotteries thereby authorised; and that a cer-
tain *Palmer Canfield*, of the city of *New York*, in the year
1824, made contracts with the said governments severally, for
the purchase or use and enjoyment, in whole or in part, of the
lottery privileges granted them by the acts of Assembly afore-
said; and that the schemes by him submitted *for* approval,
and approved under said acts, being twelve in number, amount-
ed in all to one million five hundred and forty-nine thousand
seven hundred and sixty-five dollars, and that ten of said
schemes, amounting to six hundred and eighty-seven thousand
three hundred and sixty-five dollars, were drawn by himself
or his agents, or by the Commissioners of Lotteries for him,
and at his instance; and that the two remaining schemes,
amounting to eight hundred and sixty-two thousand four hun-
dred dollars, were either drawn by him or his agents, or if un-
drawn, are so by reason of the negligence, default and fraud
of the said *Canfield*, in this behalf, who made sale of, and re-
ceived the money for a large number of the tickets in said two
last mentioned schemes, more than fourteen years since.   The
said State further sheweth to your honors, that the prizes in
each of the schemes submitted by, and approved for, said
*Canfield* aforesaid, and by him advertised, amounted to the
sum which would have been raised by the sale of the whole of
the tickets in such scheme, and that each and every ticket
issued in each of said schemes, contained upon its face a stipu-
lation that the holder should submit to a deduction of fifteen
per cent. from such prize as it might draw.   And the said
State also sheweth to your honors, that the whole sum of one
hundred and sixty thousand dollars, authorised to be raised by
the acts of Assembly aforesaid, with the expenses legally
chargeable in addition, was raised by the said *Canfield*, under
the schemes aforesaid, and certain other schemes, amounting
to three hundred and eighty-three thousand seven hundred and
forty-five dollars, drawn in fact on his account by *Yates and
McIntyre*, of *New York*, and that the lottery privileges by said
acts granted, were by him exhausted and extinguished.   And

the said State further sheweth to your honors, that the said *Palmer Canfield*, in addition to the schemes of lotteries by him submitted for approval, and approved, including those already stated to have been drawn in fact on his account, did advertise and draw in the State of *Connecticut*, through his agent, one *Dana*, of the firm of *Paine, Burgess & Dana*, certain other schemes of lotteries to an amount to the said State unknown, but believed and charged to be upwards of one hundred thou-sand dollars, purporting to be authorised by the acts of Assembly aforesaid, but which were never by him or said agent submitted for approval, or approved, according to the requirements of said act in that behalf. And the said State further sheweth to your honors, that the only surety in the bonds required by the acts aforesaid to be given by the purchaser of the schemes of lotteries thereby authorised, and which were given in conformity by said *Palmer Canfield*, is either dead, insolvent, or resides without this State, and that no other person than said *Canfield* has given or tendered any bond as purchaser, or in any other capacity, under said acts, except *Yates and McIntyre*, for the amount drawn by them as hereinbefore stated. And the said State further sheweth to your honors, that the said State, on the 20th of November, 1829, recovered judgment against the said *Palmer Canfield*, for the sum of sixteen thousand five hundred and sixty-eight dollars, in the Circuit Court of the *United States* for the second circuit, in and for the Southern District of *New York*, in an action of assumpsit in said court, instituted on the last Monday of October 1828, after which, to wit, some time in the year 1833, the said *Palmer Canfield* died insolvent, leaving the said judgment wholly unsatisfied. And the said State further sheweth to your honors, that a certain *Robert B. A. Tate*, of the city of *Baltimore*, hath obtained letters of administration from the orphans court of *Baltimore* county, upon the personal estate of the said *Palmer Canfield;* and that on the 17th of February, 1840, an action of debt was instituted, and is now pending in *Baltimore* county court against the said *Tate*, as such administrator, upon the judgment aforesaid, by *Michael McBlair*,

*Samuel S. Dickinson* and *George Cooke*, esquires, the said State's Commissioners of Lotteries. The said State also sheweth to your honors, that *James Phalen* and *Francis Morris*, partners under the firm of *James Phalen and Company*, falsely alleging themselves to be entitled to the lottery privileges granted as aforesaid, by virtue of pretended assignments thereof from the said *Palmer Canfield*, through a certain *Felix Pascales*, of *New York*, his pretended immediate assignee, propose and offer to draw, on the 18th of February, 1840, in the city of *Baltimore*, the scheme of a lottery authorised (as they aver in their advertisement thereof, which they have caused to be inserted in one or more of the daily papers published in the city of *Baltimore*, and a copy of which is herewith filed, which it is prayed may be taken as part of this bill,) by acts of the General Assembly of *Maryland*, for the benefit of *Washingington* and *St. John's Colleges*, and which said scheme has never been submitted for approval, or been approved by the Commissioners of Lotteries. And the said State further showeth to your honors, that the pretended assignment aforesaid, from the said *Canfield* to the said *Pascales*, (who was the father-in-law of said *Canfield*, a doctor of medicine, in no wise acquainted with, or engaged in the lottery business, either at that time or before or after, and of narrow means,) was made, if at all, without consideration, and fraudulently, to defeat and delay the judgment aforesaid, and execution thereon. And the said State further sheweth to your honors, that the said *Canfield* had no power by the acts aforesaid, or the action under the same, of the governments of the colleges aforesaid, to make any assignment of his purchase from said governments, in the form which he is falsely alleged to have adopted, or in any other form; and that the said *Canfield* never did make any such assignment to the said *Pascales*, or if he did, that the said *Pascales* never did make assignment to the said *Phalen and Morris*, of any interest derived by him in the premises from said *Canfield*, and that the said *Phalen & Morris* are not the assignees, in law or in fact, of any rights acquired by said *Canfield*, under his purchase aforesaid, or of any of said rights

pretended to have been communicated by him to the said *Pascales*. And the said State further sheweth to your honors, that the said *Felix Pascales*, the pretended immediate assignee of the said *Palmer Canfield*, hath departed this life, and that no letters testamentary or of administration upon his estate, have been granted in this State. And the said State also sheweth that no power was conferred, or could or can be exercised, under the acts aforesaid, to propose or draw any scheme of a lottery purporting to be jointly authorised by the grants made severally as aforesaid, to *Washington* and *St. John's* Colleges. And the said State further sheweth to your honors, that *Michael McBlair*, *Samuel S. Dickinson* and *George Cooke*, esquires, the State's Commissioners of Lotteries for the present time being, believe that the scheme of a lottery, proposed and offered to be drawn as aforesaid, is unauthorised by the laws of this State. In tender consideration whereof, and inasmuch as the appropriate remedy of the said State in the premises is in equity,—To the end, therefore, that the said *James Phalen* and *Francis Morris*, and *Robert B. A. Tate*, may full, true and perfect answers make, on their several and respective corporal oaths, to all and singular the premises, and that as fully as if thereto specially interrogated; and that by this honorable court it may be adjudged, ordered and decreed, that the said *James Phalen* and *Francis Morris*, and their agents and servants, be perpetually enjoined and restrained from proposing or offering to draw, or drawing or disposing of any scheme or schemes of lotteries, under and by virtue of the acts of Assembly aforesaid, and that the said State may have all such other and further relief in the premises as the case hereinbefore set forth shall in equity demand.

The said State respectfully asks that the court here do grant, as well the State's writ of injunction (pursuant to the direction of the 21st section of an act of Assembly, passed at December session 1828, entitled, "A supplement to an act entitled, an act to amend the lottery system,") to the said *James Phalen* and *Francis Morris* to be directed, strictly commanding and enjoining them, their servants and agents, from proceeding in

the drawing of the lottery by them offered and proposed to be drawn in the city of *Baltimore*, on the 18th day of February, 1840, and purporting to be so offered and proposed by authority of acts of the General Assembly, for the benefit of *Washington* and *St. John's* Colleges, till their right to draw the same can be determined; and also the State's writ of subpœna, &c.

Upon this bill the county court ordered an injunction to issue.

The joint and separate answer of *James Phalen* and *Francis Morris* alleged, that it is true as stated in said bill of complaint, that by the various acts of Assembly in said bill mentioned, certain lotteries were authorised to be drawn, in order to raise funds for *Washington* and *St. John's* Colleges, and by said acts the governments of said colleges were authorised, either to draw said lotteries or to sell the right of drawing the same to any other person or persons whomsoever. And these respondents further admit, that the right of raising the sums of money in said acts mentioned, was duly and regularly assigned, for value received, to *Palmer Canfield*, of the city of *New York*. And these respondents further answering, admit, that said *Canfield* submitted for approval to the Governor and Chancellor of the State, the system of schemes of lotteries, amounting to a large sum nominally, and these respondents admit that ten of said schemes, amounting in the gross to the sum of six hundred eighty-seven thousand three hundred and sixty-five dollars, were drawn by said *Canfield* or his agents, but these respondents deny that any other schemes were drawn by said *Canfield*, and they also deny that tickets to any extent, in any other schemes, were sold by him or his agents; and they also deny that any of such tickets of the few which were sold, remains outstanding, unless they be in the hands of dealers who never paid for them, *Canfield* having redeemed all which were paid for. And these respondents further answering, admit, that the prizes in each of the schemes submitted by, and approved for said *Canfield*, and by him advertised, amounted to the sum which would have been raised by the sale of the whole of the tickets in such scheme, and that each and every ticket

issued in each and every scheme, contained upon its face a stipulation, that the holder should submit to a deduction of fifteen per cent. from such prize as it might draw; but these respondents expressly deny, that either one hundred and sixty thousand dollars, or any other sum exceeding thirty thousand dollars, was raised, either by said *Canfield* or by any person drawing lotteries under the aforesaid grants, so assigned as aforesaid to said *Canfield*, including the drawing of *Yates and McIntyre* and *Francis W. Dana;* but these respondents verily believe, that said *Canfield* made large losses by such drawings, never having sold one-third of the tickets in said schemes, and several very high prizes having been drawn by holders of said tickets sold as aforesaid; and in confirmation of this denial, these respondents state, that from the 1st of December, 1838, to the 1st of December 1839, schemes were issued by the Commissioners of Lotteries for this State, amounting to about five millions of dollars, from which they derived but about twenty thousand dollars; and further, that said commissioners require of the contractors for such schemes, merely an allowance of five per cent. upon the tickets sold, and not upon the gross amount of the schemes. And these respondents utterly deny, that the lottery privileges by said act granted, have been exhausted or extinguished. And these respondents further answering, admit, that under such grants *Yates & McIntyre* drew several schemes, amounting in the gross to three hundred eighty-three thousand seven hundred and forty-five dollars, for which said *Yates & McIntyre* paid said *Canfield* eight thousand dollars, and no more; and they also admit, that *Dana* did draw one scheme, and no more, and that the gross profits were three hundred forty-eight dollars and seventy-five cents, and no more. Whether such last drawing took place on the approval of the Commissioners of Lotteries, these respondents do not know, and cannot therefore admit or deny. And these respondents admit, that no other security, except that given by *Canfield* and *Yates & McIntyre*, has been given, but aver that these respondents are ready and willing to file any bond with such satisfactory security as may be required by the pro-

per authorities.   And these respondents further answering, admit the recovery of the judgment of the said State in the manner and at the time stated in said bill of complaint, and that said *Palmer* having been ruined by the loss upon the drawing of said lotteries, and other causes, died at or about the time stated, insolvent, not having satisfied said judgment; and they further admit, that letters of administration upon the estate of said *Canfield*, have been granted in *Maryland* to *Robert B. A. Tate*, the clerk of the Commissioners of Lotteries, who your respondents verily believe obtained said letters under the direction, and at the instance of said commissioners or their counsel; and they also admit the pendency of said actions of debt against said *Tate*, as is alleged in said bill.   And these respondents further admit, that they did propose and offer to draw the scheme of a lottery on the 18th day of February, now last past, but they deny that they falsely alleged themselves entitled to do so by virtue of any pretended assignments, but on the contrary aver, that they are *bona fide* assignees for valuable consideration of the grants to said colleges, and they herewith state the dates and times of such assignments, which they are ready to produce and prove, when and where this court shall require.   *Palmer Canfield*, on the 29th day of July, 1829, assigned to *Felix Pascales* the said grants, in trust to sell the same, and from the proceeds thereof to pay a debt due to said *Pascales*, and another one to *James Raymond*, with interest on such debts; that said *Felix* died, having first made his last will and testament, bequeathing all his estate to his son, *Cyril O. Pascales*, and also appointing him executor of such will; that said *Cyril* advertised and sold such grants at auction, to *Alexander G. Anderson*, and on the 19th day of February, 1834, assigned and conveyed the said grants to said *Anderson;* that on the 22nd day of February, 1834, the said *Anderson* conveyed the same to *James Raymond*, of the city of *Baltimore*, and on the 13th day of December, 1838, the said *Raymond*, for full value, assigned and transferred the same to these respondents, and these respondents verily believe, that all of said assignments were fairly made, and for a

valuable consideration. And these respondents further answering, admit, that the schemes by them proposed to be drawn, were not submitted for approval, or approved by the Commissioners of Lotteries, these respondents submitting that they were not by law bound to submit the same for approval to such commissioners, and these respondents well knowing that no scheme submitted by them would be approved. And these respondents further answering, deny, that the assignment made by said *Canfield* to *Felix Pascales* was fraudulent, or without consideration, or fraudulently or otherwise to defeat and delay the aforesaid judgment rendered against said *Canfield*, or any other judgment. And these respondents insist, that said *Canfield* had the power of transferring the said lottery grants, and that these respondents are the assignees of such lottery grants ; and these respondents admit, that said *Felix Pascales* is dead, and that no letters testamentary, or of administration, upon his estate have been granted in *Maryland*. And these respondents pray to be hence dismissed with costs.

After this, the cause was prepared for a final decree by admissions of facts and the filing of documentary proof, all of which, so far as is necessary to the understanding of the opinion and application of the principles decided in this court, sufficiently appear in the opinion delivered in this cause. At the final hearing, *Baltimore* county court (PURVIANCE, A. J.,) decreed that the defendants be, and are perpetually enjoined and restrained from proposing or offering to draw, or disposing of any scheme or schemes of lotteries under or by virtue of the acts of Assembly in the bill in this cause mentioned.

From this decree the defendants appealed.

The cause was argued before BUCHANAN, C. J., STEPHEN, ARCHER, DORSEY, CHAMBERS, and SPENCE, J.

By G. R. RICHARDSON and R. JOHNSON for the appellants.

By J. MASON CAMPBELL and McMAHON for the appellees.

DORSEY, J., delivered the opinion of this court.

It is admitted, that if all the tickets had been sold in the schemes, which have been drawn under the lottery grants in favor of *Washington* and *St. John's* Colleges, that a larger amount would have been raised than was authorised by the acts of Assembly under which the drawings took place.    But it is insisted on the part of the appellants, that notwithstanding the competency of the schemes drawn (had all the tickets been sold,) to have raised the sum of $160,000, as authorised by the Legislature of *Maryland,* yet, that but a small portion of that sum was, in point of fact, realized, by reason of a great portion of the tickets remaining unsold when the schemes were drawn, and by the loss of the wheel, in the high prizes coming up to the tickets which had been sold.

The first question, then, raised for our determination, is, have the lottery grants in question been exhausted by the drawing of lotteries, competent, upon the face of the schemes, to have realized the prescribed amount, or, as contended for by the appellants, are the owners of the privilege at liberty thereafter to continue their drawings, until, by the gain of the wheel or the sale of tickets, the specified amount shall have been actually raised?

But the act of 1816, chap. 89, and by the supplement thereto of 1823, chap. 193, the *Visitors and Governors of Washington College* are authorised to propose a scheme or schemes of a lottery or lotteries, for raising a sum of money, not exceeding eighty thousand dollars ; and by the act of 1821, chap. 46, the *Visitors and Governors of St. John's College* are authorised "to propose a scheme or schemes of a lottery or lotteries, for raising a sum of money not exceeding eighty thousand dollars."    The assignees of the franchise possess no greater powers than did the *visitors and governors of these colleges.*    The terms in which the authority is communicated to them, are clear and unambiguous, to wit, to propose a scheme or schemes for raising a limited amount ; when the schemes for raising that amount have been proposed and drawn, the authority given has performed its office, according to the letter of the acts of Assembly by which it is conferred.    And if we

look to the legislative intent in passing those acts, the con-
struction we give them is still more strongly fortified.   But it
is said that it was the design of the Legislature, that the sum
specified should be raised.   Doubtless, such was its intention.
A failure to effect it was not within its contemplation.   It had
given adequate means for its accomplishment, had they been
pursued in the contemplated mode.   It was the duty of the
owner of the schemes, in the exercise of his franchise, pre-
viously to their drawing, to have sold all the tickets.   Upon
this assumption only did the Legislature act.   It did not de-
sign to confer a floating, gambling power, of indefinite dura-
tion, which should expand and contract with the gain or loss
of the wheel.   But the amount to be raised (in the absence of
all subsequent legislation, providing a different mode of raising
it, as for example, by the consolidation system, or any other
mode that might be prescribed,) was to be obtained by a sale
of all the tickets embraced by the scheme, in the manner it
prescribed.   That such was the legislative intent, we think
apparent on the face of the lottery grants before us, but is
clearly deducible from all prior and subsequent enactments
upon the subject.

In requiring bonds to be given for the payment of prizes, it
cannot be doubted that the Legislature believed it had provi-
ded ample security, in this respect, for the owners of prize
tickets; upon no other terms would it have made the grants in
question.   What are the provisoes upon which those grants
were made by the acts of 1821, chap. 46, and of 1821, chap.
224?   They are, that the purchaser or purchasers of such
scheme or schemes, shall before the sale or disposal of any
ticket or tickets in said lottery or lotteries, give bond to the
State of *Maryland*, in the penalty of one hundred and sixty
thousand dollars, to be approved by the *Governor and Council*,
conditioned that he or they will well and truly apply so much
of the money arising therefrom, within twelve months after the
drawing of the said lottery or lotteries shall commence, as will
satisfy the fortunate adventurers for prizes drawn by them, and
defray the necessary expenses incurred in the management

thereof.   It is too clear for argument or doubt upon the subject, that by the condition of those bonds, the obligors are no further bound than for the money arising from the sale of tickets.   What then is the irresistible inference of the intention of the Legislature in making these grants?   It is, that to warrant the drawing of a lottery, there must have been a sale of all the tickets in the scheme.   Such being the apparent intention of the Legislature, upon every principle of sound construction we are bound to give an accordant interpretation to its acts.   To give to those lottery grants the exposition which has been claimed for them by the appellants, that the schemes may be drawn at the will of the purchaser, as soon as any portion of the tickets are sold, would impute to the Legislature a design to grant an almost interminable license to the most reckless, fraudulent system of gambling that could well be practised upon the thoughtless and unsuspecting.   The inducement to such a system of gaming is too obvious to be overlooked.   The purchaser after the acquisition of the grants, would have everything to gain, and could lose nothing.   In the almost infinite series of schemes which he might draw, no tide of ill luck that could be anticipated, could prevent the filling of his coffers by unrighteous acquirements.   The gain of the wheel in every scheme drawn was all his own; its losses were thrown on the owners of the prize tickets.   He might gamble indefinitely at the risk of others; of his own, nothing was put to hazard.

That we have construed correctly the acts of Assembly in question, we think demonstrated by the first section of the act of 1810, chap. 154, which declares, "that in all cases where lotteries have been heretofore authorised, under which power is given to raise a particular sum of money by one or more lotteries, and the managers may have drawn a lottery or lotteries, the scheme of which purported to raise the sum authorised to be raised, that in all such cases the power and authority given to raise money thereby" is completed, and the power to draw any other lottery or lotteries under the same authority, at an end.   If such were the legislative design in all previous like

enactments, upon what recognized principle of sound con-
struction can you give a different interpretation to the acts of
Assembly now under consideration?   And even conceding, as
was slightly intimated in the argument, that this retrospective,
declaratory law, is unconstitutional and void as to prior lottery
grants, which otherwise would be differently construed, yet in
all subsequent similar legislation, such a declaration of the will
or intent of the Legislature must be regarded as of overwhelm-
ing influence, in the construction of its acts, and such is the
case before us.

Believing the lottery privileges, created by the acts of 1816,
chap. 89, and 1821, chap. 224, and 1821, chap. 46, to have
been exhausted by the schemes which have already been drawn
under said acts, we deem it unnecessary to examine the other
questions which have been discussed in this cause.

The decree of *Baltimore* county court, perpetuating the in-
junction issued in this case, is affirmed.

<div align="right">DECREE AFFIRMED.</div>